CHARLES NOEDING TRUCKING CO. et
al. v. UNITED STATES et al.

No. 5815.

District Court, D. New Jersey.

June 20, 1939.

As Amended Oct. 4, 1939.

Julius Henry Cohen, of New York City, and Wilbur La Roe, Jr. and Arthur L. Winn Jr., both of Washington, D. C., Russell E. Watson, of New Brunswick, N. J., Aaron Z. Schomer, of Passaic, N. J., Lewis Winetsky, of Linden, N. J., Harry S. Medinets, of Perth Amboy, N. J., W. J. Egan, of Newark, N. J., and Elias B. Leiby, of New York City, for plaintiffs.

J. Stanley Payne, Asst. Chief Counsel, of Washington, D. C., and John J. Quinn, U. S. Atty., of Red Bank, N. J., for defendants.

Before BIGGS, Circuit Judge, and CLARK and FORMAN, District Judges.

BIGGS, Circuit Judge.

The plaintiffs, six in number, motor vehicle carriers for hire, variously engaged in the trucking business between New York City on the one hand and points in Newark, Elizabeth, Linden, Carteret and Perth Amboy, New Jersey, on the other, have filed a bill pursuant to the provisions of the Urgent Deficiencies Act, Act of October 22, 1913, U.S.Code, Title 28, § 41 (27) and (28) and sections 43–48, 28 U.S. C.A. §§ 41 (27, 28), 43–48, seeking to have this statutory court enjoin the enforcement of an order made by the Interstate Commerce Commission, Division 5, under the Motor Carrier Act, 1935, 49 U.S.C.A. § 301 et seq. The bill includes also a prayer for a declaratory judgment.

The Motor Carrier Act, 1935, provides for the regulation of motor carriers engaged in interstate commerce by the Interstate Commerce Commission. Section 203 (b) (8), 49 U.S.C.A. § 303(b) (8), thereof

grants a partial exemption from the operation of the Act. The pertinent portion of that section reads:

" (b) Nothing in this part [chapter], except the provisions of section 204 [304] relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment shall be construed to include

\* \* \* \* \* \* \*

nor, unless and to the extent that the Commission shall from time to time find that such application is necessary to carry out the policy of Congress enunciated in Section 202 [302 of this chapter], shall the provisions of this part [chapter], except the provisions of section 204 [304 of this chapter] relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment apply to: (8) The transportation of passengers or property in interstate or foreign commerce wholly within a municipality or between contiguous municipalities or within a zone adjacent to and commercially a part of any such municipality or municipalities, except when such transportation is under a common control, management, or arrangement for a continuous carriage or shipment to or from a point without such municipality, municipalities, or zone, and provided that the motor carrier engaged in such transportation of passengers over regular or irregular route or routes in interstate commerce is also lawfully engaged in the intrastate transportation of passengers over the entire length of such interstate route or routes in accordance with the laws of each State having jurisdiction; \* \* \*".

We will refer more specifically to Section 202 of the Act, 49 U.S.C.A. § 302, at an appropriate point.

The Interstate Commerce Commission entered an order on February 1, 1936, upon its own motion and gave notice of a hearing to be had before an examiner in New York City to determine for the proper administration of the Motor Carrier Act, the area and extent of the municipality of New York and of any municipalities contiguous thereto and of adjacent zones commercially a part of such municipalities. The nature and extent of this notice is referred to more specifically at a later point in this opinion. It was further ordered that all common and contract carriers known by the Commission to be operating within the general territory af-

fected by the order were to be notified of the hearing and that copies of the order were to be posted with the Secretary of the Commission in Washington, D. C., in the office of the New York Transit Commission at New York, New York, in the office of the New York Public Service Commission at Albany, New York, and in the office of the New Jersey Board of Public Utility Commissioners at Trenton, New Jersey.

The hearings before the examiner commenced upon March 9, 1936, and continued for four successive days. Four different zones were advocated by various proponents as the area which should be partially exempted from the regulation of the Motor Carrier Act within the meaning of Section 203 (b) (8) of that Act. The New York commercial zone favored by most was that defined in 1927 by the Merchants' Association of New York as the New York Metropolitan District. Comprising some 3,768 square miles and extending forty miles in all directions from the City Hall of New York, this district includes Rockland, Westchester and Nassau Counties, New York, part of Suffolk County, New York, part of Fairfield County, Connecticut, and Passaic, Bergen, Morris, Essex, Hudson, Somerset, Union, Middlesex and Monmouth Counties, New Jersey. According to its advocates, the economic and social life of this area is influenced predominantly by New York City. In support of the reasonableness of this zone, it was shown that in 1932 the Merchants' Association and the Publishers' Association of New York City determined the territory which could be profitably reached by the city's retail merchants and manufacturers as an area of 10,233 square miles, including five New York counties and five New Jersey counties not included in the Merchants' Association zone.

Although not opposed to the adopting of the larger area included in the Merchants' Association zone, the Port of New York Authority contended that all of the territory subject to its jurisdiction was included within the New York commercial zone. The jurisdiction of the Port of New York Authority extends over an area of about 1,200 square miles, roughly encompassing a circle with a radius of about 25 miles from the City Hall of New York City. New York City, parts of Westchester, Nassau, and Rockland Counties in New York, all of Hudson County and parts of

Bergen, Passaic, Essex, Middlesex, Monmouth, Morris and Somerset Counties in New Jersey are included in this zone. The States of New York and New Jersey, with the consent of Congress, created the Port of New York Authority by statutes of their respective legislatures in 1921. The consent of Congress was embodied in Public Resolution No. 17 of the Sixty-Seventh Congress (42 Stat. 174). That Resolution, after stating that " * * * the commerce of the port of New York has greatly developed and increased and the territory in and around the port has become commercially one center or district * * * ", provided that the Port Authority should have jurisdiction over transportation and other facilities of commerce and the making of plans for the development of the Port, and that the transportation facilities referred to in the Resolution should include motor trucks or other street or highway vehicles. The Port Authority has constructed four large bridges between New York and New Jersey, the George Washington Bridge connecting Fort Lee with 179th Street, New York, the Bayonne Bridge connecting Staten Island with Bayonne, New Jersey, the Goethals Bridge connecting Elizabeth, New Jersey, with Staten Island, and the Outerbridge Crossing connecting Perth Amboy with Staten Island. In addition the Port Authority operates the Holland and Lincoln Tunnels.

The metropolitan district of New York City as defined by the United States Census Bureau was proposed by some as the area which should be deemed to be partially exempt within the provisions of Section 203 (b) (8) of the Act. This district is almost coterminus with what we have described as the Port Authority zone. The factor governing the establishment of this district was density of population. The Census Bureau, as it does in determining metropolitan districts throughout the country, included, in addition to the central city, all adjacent and contiguous civil divisions having a density of not less than 150 inhabitants per square mile, and also, generally, those civil divisions of less density which are directly contiguous to the central city or are entirely surrounded by minor civil divisions of the required density.

The shippers who favored either the Merchants' Association zone or the Census Bureau District deliver their products in those areas in their own trucks or in those of hired carriers but without additional charges to the shippers' customers. Testimony given on behalf of these shippers indicated that if the regulations required by the Act were put into effect in these localities, the cost of transportation would be increased to such an extent that these arrangements would become impossible.

Those motor carriers supporting the three suggested zones heretofore referred to contended that their operations within the areas designated were of the local cartage type essentially different in character from over-the-road trucking. They further contended that their operations were not of such a character as to cause them to compete with railroads or over-the-road motor carriers. They also took the position that the tariffs inaugurated by over-the-road carriers were not adaptable to their services.

The United Parcel Service for its part urged that the area served by it in making deliveries for New York and Newark department stores be adopted as the New York commercial zone. Such deliveries are made without charge to customers purchasing goods at the stores. This, the fourth zone proposed, is larger than the Merchants' Association zone. It was supported by the department store of R. H. Macy & Co. which makes deliveries in its own trucks in substantially the same area.

Some of the factors alleged in support of these four zones as the New York commercial district by their respective proponents were in the percentage of the populations of the New Jersey municipalities commuting to New York for work, the free deliveries of retail purchases from New York to the New Jersey communities, the substantial character of those purchases, the establishment of industries in New Jersey because of the proximity of the vast New York market, the equal water-transportation rates from outside ports to both the ports of the New Jersey cities and the port of New York, the density of populations, deliveries of New York newspapers to the New Jersey area, and the volume of local truck traffic between the points in New Jersey and New York.

The New Jersey Motor Truck Association, except its Hudson County branch, and also various associations of furniture warehouses and movers of household goods located in New York and New Jersey contended that no transportation of goods by motor carrier between New York and New Jersey should be exempt. This con-

542

tention was not based upon an allegation that parts of New Jersey are not within the New York commercial district, but upon the allegation that the chaotic condition of truck transportation between those points demanded regulation within the terms of the Motor Carrier Act.

After hearing the testimony and considering briefs filed by the parties, the examiner submitted a proposed report in which he found that the area which should be deemed to be exempt from the provisions of the Act was almost coterminus with the area within the jurisdiction of the Port of New York Authority. The cities of Newark, Elizabeth, Linden, Carteret and Perth Amboy were embraced within the proposed zone of the exemption. The examiner made no recommendation as to the removal of any exemption.

Exceptions to the examiner's proposed report, which need not be ·detailed here, were filed with the Commission and oral argument was had before it. On April 5, 1937, the Commission handed down a report, No. MC-C-2, 1 M. C. C. 665, setting out the contentions of the parties about as we have outlined them above and held that that area which should be deemed to be exempt from the provisions of the Act pursuant to Section 203 (b) (8) as the New York commercial zone comprised " * * * New York, Yonkers, Mount Vernon, North Pelham, Pelham, Pelham Manor, Great Neck Estates, Floral Park, and Valley Stream, N. Y.; Englewood, N. J.; Alpine, Tenafly, Englewood Cliffs, Leonia, Fort Lee, Edgewater, Cliffside Park, Fairview, Palisades Park, and Ridgefield Boroughs, Bergen County, N. J.; and that part of Hudson County, N. J., east of the Hackensack River and Newark Bay." The cities of Newark, Elizabeth, Linden, Carteret and Perth Amboy were not included in this area. The Commission recognized that some of the New Jersey cities which were not exempted were contiguous to New York, but, as to them said at page 671:

"Among the cities and towns which would be excluded from the commercial zone would be some, such as Elizabeth and Perth Amboy, for example, which are separated from Staten Island by Staten Island Sound or Arthur Kill only, and are therefore contiguous, in a sense, to the city of New York. Except for the relatively small amount of traffic, however, which moves between Staten Island and these points on

the western shore of the Sound, the logical route for movement by motor vehicle from the remainder of the city of New York is through Newark, a point which we do not propose to include in the commercial zone, and is interterminal in character. In our opinion, therefore, these points along the western shore of the Sound are not within the area adjacent to and commercially a part of New York within the meaning of Section 203 (b) (8). As stated in St. Louis, Mo.-East St. Louis, Ill., Commercial Zone, supra:

" 'The exemption provided in section 203 (b) (8) applies to transportation between contiguous municipalities "unless and to the extent" we find that the application of all provisions of the act is necessary to carry out the policy of Congress enunciated in section 202 (a). We believe that that policy requires that the regulatory provisions of the act should, in general, be applied to interterminal transportation and that where * * * two cities are ·contiguous in the sense that their boundaries join at some place but are not part of a single terminal, there should be no exemption.' "

The quoted reference to Newark is the only statement made by the Commission in respect to the exclusion of that city from the exempted zone.

On the same date, the Commission entered an order making effective the exemption for the territory above mentioned, and in the third paragraph of its order proceeded "to remove" the exemption as to the contiguous areas specified above in the following language: "It is further ordered, That the exemption in section 203 (b) (8), to the extent it affects transportation by motor vehicle between Elizabeth, Linden, and Perth Amboy, N. J., and that part of New Jersey east of U. S. Highway 9 extending southward from the city limits of Linden to the city limits of Perth Amboy, on the one hand, and points in the above-described zone, on the other, be, and it is hereby, removed and that said transportation be, and it is hereby, subjected to all of the provisions of the Motor Carrier Act, 1935."

Motions and petitions for reargument and reconsideration filed by various parties with the Commission were denied. On June 11, 1937, however, the Commission issued a supplemental report, No. MC–C–2, 2 M. C. C. 191, explaining the considerations which guided the drafting of the original

report. From this supplemental report, it appears that the Commission construed section 203 (b) (8) as meaning that Congress intended that transportation "intra-terminal" in character should be exempt, whereas "interterminal" transportation should be subjected to the regulation prescribed by the Motor Carrier Act. The Commission concluded in effect that only motor carrier operations of the local cartage type should escape supervision.

The plaintiffs thereupon filed the bill in suit. The testimony received in the pending suit makes plain that a substantial portion of their business consists in the cartage of goods between Newark, Elizabeth, Linden, Carteret and Perth Amboy in New Jersey and New York City. Various interested municipalities within the areas affected sought intervention in these proceedings and such interventions have been allowed by this court.

### As to Certain Procedural Matters.

The parties have raised certain procedural questions which we think should be disposed of before considering the substantial issues raised in the case at bar. The plaintiffs contend that as a hearing was necessary before the Commission had power to remove the existing statutory exemption, the notice issued upon February 1, 1936, should have contained specific mention of the fact that the Commission proposed to deal with the removal of such exemption and that therefore, since no such notice was given, the Commission was without authority to enter the order made. Next the plaintiffs contend that even if the hearing was held upon adequate notice the Commission did not make such findings as were necessary to support its order. In answer to the objections raised as to the sufficiency of its procedural steps, the Commission contends that the hearing was held upon adequate notice and that the findings made by it are of such a nature as to support its order. The Commission, moreover, takes the position that as its order (entered the same day as its first report heretofore referred to) merely defines those territories which are to be deemed to be within or without the exemption cre-ated by Section 203 (b) (8) of the Act, the order is merely administrative in its nature, is not a "proceeding" within the provisions of section 205 (f) of the Act, 49 U.S.C.A. § 305 (f),[1] and therefore no notice was required in the premises. If this be the case, this court is without power to grant the injunctive relief sought. In other words, if the determination of exemption within the meaning of Section 203 (b) (8) is purely an administrative function of the Commission this court is without jurisdiction of the pending cause. It would follow therefore, if this be correct, that if the plaintiffs should refuse to comply with the regulations imposed by the Motor Carrier Act while operating in the territory covered by the Commission's order the Commission would then be required to make a further order upon the plaintiffs to require them to comply with the regulatory provisions of the Act. Section 222 (a) of the Act, 49 U.S.C.A. § 322 (a), however, provides that a penalty may be imposed upon any motor carrier which shall knowingly and wilfully violate any provision of the Act or any rule, regulation or order promulgated thereunder.

The plaintiffs take the position that they are not required to incur penalties in order to test the validity of the exempt zone created by the Commission's order. They urge that the right to institute the pending suit is conferred upon them by the provisions of Section 205 (h) of the Motor Carrier Act, 49 U.S.C.A. § 305 (h). This provides that "Any final order made under this chapter shall be subject to the same right of relief in court by any party in interest as is now provided in respect to orders of the Commission made under chapter 1 of this title." The right given to an interested party to review the orders of the Commission conferred by Section 208 of the Judicial Code (28 U.S.C.A. § 46) is therefore carried over into the Motor Carrier Act. The word "final" however is used to qualify the phrase "Any * * * order" occurring in Section 205 (h). We therefore must first determine whether or not the order here made by the Commission is in its nature a final order. If it is

---

[1] Section 305 (f) provides: "In accordance with rules prescribed by the Commission, reasonable notice shall be afforded, in connection with any proceeding under this chapter, to interested parties and to the board of any State, or to the governor if there be no board, in which the motor carrier operations involved in the proceeding are or are proposed to be conducted, and opportunity for intervention in any such proceeding * * * shall be afforded to all interested parties."

such it follows, we think, that it was made in a "proceeding" within the meaning of Section 205 (f) of the Motor Carrier Act.

We conclude that the order sub judice is a final order for since it at least defines the exempt zones and purports to remove the qualified exemption from certain municipalities which are in fact contiguous within the meaning of Section 203 (b) (8) (for example Perth Amboy, Carteret, Linden and Elizabeth are physically contiguous to Richmond save only for the interposition of the Arthur Kill), its effect is to subject such carriers as do not comply with the regulations imposed by the Act to the penalties prescribed by the Act. The Commission's order therefore withdraws from the plaintiffs that partial immunity from regulation which they acquired by reason of the provisions of Section 203 (b) (8). As was stated by the Supreme Court in the case of Powell v. United States, 300 U.S. 276, 285, 57 S.Ct. 470, 475, 81 L.Ed. 643, " * * * overemphasis upon the mere form of the order may not be permitted to obscure its purpose and effect." It cannot be denied that the plaintiffs have a pecuniary interest in the order and are affected substantially by its provisions. We deem a final order to be one which ends the action or proceeding before the tribunal which makes it, leaving nothing further to be determined by that tribunal or required to be accomplished other than the administrative execution of the decision. A correct analogy to this phase of the case at bar is supplied by those cases which deal with the rate making powers of the Commission for other interstate carriers. See United States v. Los Angeles & S. L. R. Co., 273 U.S. 299, 309, 47 S.Ct. 413, 71 L.Ed. 651; Procter & Gamble Co. v. United States, 225 U.S. 282, 293, 32 S.Ct. 761, 56 L.Ed. 1091; United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023.

In the case of Rochester Telephone Corporation v. United States, 59 S.Ct. 754, 758, 83 L.Ed. 1147, decided April 17, 1939, the Supreme Court, by Mr. Justice Frankfurter stated: " * * * where the Commission's order denies an exemption from the terms of the statute, as in the Intermountain Rate Cases, 234 U.S. 476, 34 S. Ct. 986, 58 L.Ed. 1408, the road to the courts' jurisdiction seems to be clear. There is a constitutional 'case' or 'controversy,' Interstate Commerce Commission v. Brimson, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047; the requirements of equity are satisfied if disregard of the Commission's adverse action entails threat of oppressive penalties; and the suit is within the express language of the Urgent Deficiencies Act in that it is one 'to enjoin, set aside, annul' an 'order of said commission.' 28 U.S.C. Secs. 46, 47, 28 U.S.C.A. §§ 46, 47. While the penalties may be imposed by the statute for its violation and not for disobedience of the Commission's order, a favorable order would render the prohibitions of the statute inoperative." Nor is the jurisdiction conferred by the Urgent Deficiencies Act limited to suits by carriers to avoid statutory penalties. Such suits may be maintained by other parties in interest. See Claiborne-Annapolis Ferry Co. v. United States, 285 U.S. 382 [52 S.Ct. 440, 76 L. Ed. 808]; Mississippi Valley Barge L. Co. v. United States, 292 U.S. 282, 293 [54 S. Ct. 692, 78 L.Ed. 1260]. We therefore conclude that if the order of the Commission has not been entered upon due notice the plaintiffs are entitled to the relief which may be granted them by this court since the order of the Commission in our opinion was a final order entered in a "proceeding".

We are of the opinion, however, that the notice given by the Commission of its proceeding was adequate and sufficiently disclosed the subject with which the Commission proposed to deal. The notice, which was in the form of an order,[2] recited the necessity for the proper administration of the Motor Carrier Act to de-

---

[2] The pertinent parts of the order and notice provide:

"It appearing, That it is necessary for the proper administration, execution, and enforcement of the Motor Carrier Act, 1935, that a determination be made of the extent and area of the municipality of New York, N. Y., and of any and all municipalities contiguous thereto, and of the zone adjacent to and commercially a part of said municipality or municipalities, and whether said municipalities are contiguous, within the meaning of Section 203 (b) (8) of the said Act, and that a hearing or hearings should be had for the purpose of taking testimony and investigating and determining said matters:

"It is ordered, That an investigation and inquiry be, and it is hereby, instituted by the Commission, on its own motion, in order to determine and define the area and extent of the municipality of New York, N. Y., and of any municipal-

termine the extent and area of the New York municipal zone and of the zones commercially a part of it. The inquiry was directed to that end. While it is true that the word "exemption" or the phrase "to exempt" is nowhere used in the notice, it was none the less the express intention of the Commission "to determine and define" the extent of the municipality of New York and those adjacent zones and municipalities commercially an integral part of the New York zone. Expressly, this was to be done within the meaning of the provisions of Section 203 (b) (8) of the Motor Carrier Act. We cannot conclude otherwise than that notice that an exempt area is to be determined is notice that zones and municipalities not within that area are to be without exemption and ·therefore are to be brought within the regulatory provisions of the Act.

### As to the Power of the Commission to Make the Order Here Made.

■ If it be within the power of the Commission to define the area partially exempted and to remove other localities from that exemption, it must exercise its jurisdiction within the terms of the Act and specifically within the provisions of Section 202 of the Act, 49 U.S.C.A. § 302. Section 203 (b) ·(8) so requires since that section provides that the partial exemption conferred by it shall not be stricken down except to the extent that the Commission shall determine that the application of the provisions of the Act is necessary "to carry out the policy of Congress enunciated in section 202 [302] * * *".

Section 202 (a) of the Act, 49 U.S.C.A. § 302 (a) states: "It is hereby declared to be the policy of Congress to regulate transportation by motor carriers in such manner as to recognize and preserve the inherent advantages of, and foster sound economic conditions in, such transportation and among such carriers in the public interest; promote adequate, economical, and efficient service by motor carriers, and reasonable charges therefor, without unjust discriminations, undue preferences or advantages, and unfair or destructive competitive practices; improve the relations between and coordinate transportation by and regulation of, motor carriers and other carriers; develop and preserve a high-way transportation system properly adapted to the needs of the commerce of the United States and of the national defense; and cooperate with the several States and the duly authorized officials thereof and with any organization of motor carriers in the administration and enforcement of this chapter."

The intent of Congress as set forth in Section 202 (a) of the Act may be summed up as the promotion of adequate transportation by motor carriers under fair practices, the improvement of relations between all types of carriers and the development of commerce and national defense. An examination of the Act as a whole shows that its purpose is the regulation of motor carriers in interstate and foreign commerce upon much the same terms and conditions under which the Interstate Commerce Commission regulates interstate and foreign commerce upon railroads of the United States. For example, Section 204 of the Act, 49 U.S.C.A. § 304, requires the Commission to establish reasonable requirements for continuous and adequate service, the qualifications of and maximum hours of labor for employees, and for the safety of motor carrier operation and equipment. This section also provides for the regulation of brokers and for the establishing of reasonable requirements as to their licensing and financial responsibility. Section 204 (a) (6) provides that the Commission shall administer the provisions of the Act and make all necessary orders, rules and regulations required to that end. Section 204 (b) provides for the application of codes of fair competition and for the invalidation of any code which is in conflict with or is inconsistent with the provisions of the Act. Section 204 (d) provides for the investigation of complaints made to it by the Commission. Many other pertinent provisions showing the fundamental purposes of the Act might be referred to all of which show what may be embraced by Section 202, but we think it is sufficient to state that the Commission has the power and indeed the duty to remove the partial exemption conferred by ˙Section 203 (b) (8) when that is necessary to promote the efficiency of motor. carrier transportation in interstate and foreign commerce. Such being the case, is the language of Section 202 to be deemed to

ity or municipalities contiguous thereto and of the zone adjacent to and commercially a part of such municipality or municipalities, and to take such other action and make such other findings, determinations, and orders in the premises as the facts and circumstances may appear to warrant."

be sufficiently explicit? Does this Section constitute an unconstitutional delegation of power by Congress to the Commission? This, in our opinion, is one of the fundamental questions presented by the case at bar and it is one upon which the plaintiffs lay great emphasis, contending that it must be resolved in their favor.

### Is the Authority Granted the Commission to Remove the Partial Exemption an Unconstitutional Delegation of Legislative Power?

■ It is fundamental of course that Congress may not delegate its basic power to make a law. That principle was restated in Panama Refining Co. v. Ryan, 293 U. S. 388, 421, 55 S.Ct. 241, 79 L.Ed. 446, but the Supreme Court in the case cited, 293 U.S. at page 421, 55 S.Ct. at page 248, 79 L.Ed. 446, also said: " * * * The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply. Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility."

■ Is the rule which is laid down in Section 202 of the Act so indefinite as to constitute a delegation of legislative power by Congress? Congress must lay down clear standards of governance if it is to leave to its agencies "the making of subordinate rules" based upon those standards. In our opinion the case at bar, presents a close analogy to the Intermountain Rate Cases, 234 U.S. 476, 485–489, 34 S.Ct. 986, 988, 58 L.Ed. 1408. In the cited cases the Supreme Court had under consideration Section 4 of the Interstate Commerce Act (as amended by the Act of June 18, 1910, § 1, 36 Stat. 547, U.S.C., Tit. 49, § 4, 49 U.S.C.A. § 4). As stated by Mr. Chief Justice White, "The provisions of § 4 of the act to regulate commerce * * *, dealing with what is known as the long and short haul clause, the power of carriers because of dissimilarity of circumstances and conditions to deviate from the exactions of such clause, and the authority of the Interstate Commerce Commission in relation to such subjects, were materially amended by the act of June 18, 1910, chap. 309, 36 Stat. at L. 547 * * *". The amending act referred to provides, among other things, that " * * * upon application to the Interstate Commerce Commission * * * " a common carrier " * * * may in special cases, after investigation be authorized by the Commission to charge less for longer than for shorter distances for the transportation of passengers or property; and the Commission may from time to time prescribe the extent to which such designated common carrier may be relieved from the operation of this section." It was alleged that the section as amended was unconstitutional in that the authority given to the Commission was unlawfully delegated by Congress. The Supreme Court held that this contention was without merit. In the cited case Congress gave authority to the Commission to relieve a common carrier under special circumstances of the burden imposed by the long and short haul clause of the Interstate Commerce Act, for the benefit of commerce. In the case at bar Congress gave the Commission power to remove the partial exemption conferred · by Section 203 (b) (8) of the Motor Carrier Act for the like benefit of commerce. True, in the instant case the removal of the exemption results in the regulation of certain carriers, while in the cited case the exercise by the Commission of the powers conferred by the amendment effected a partial release of the carrier from regulation. This distinction, however seems to us to be immaterial. In the Intermountain Rate Cases the amendment allowing the exemption is less specific in its provisions than Sections 202 and 203 (b) (8) of the Motor Carrier Act, since the amendment stated nothing more than that the Interstate Commerce Commission "in special cases after investigation", might prescribe the extent to which the carrier could be relieved of the burden of the long and short haul clause.

■ There can be no doubt that it was the intention of Congress to authorize the Commission to remove the partial exemption imposed by Section 203 (b) (8) when the public interest as exemplified by interstate and foreign commerce required it.

In New York Central Securities Co. v. United States, 287 U.S. 12, 53 S.Ct. 45, 48, 77 L.Ed. 138, the Supreme Court passed upon the constitutionality of subdivision (2) of Section 5 of the Interstate Commerce

Act, U.S.C., Tit. 49, § 5 (2), 49 U.S.C.A. § 5 (2), which expressly authorized the Commission to impose conditions upon acquisition of control of one carrier by another, and affirmed the decree of a statutory court dismissing a bill to set aside orders of the Interstate Commerce Commission to such effect. Mr. Justice Hughes, delivering the opinion of the court, stated in part: "Appellant insists that the delegation of authority to the Commission is invalid because the stated criterion is uncertain. That criterion is the 'public interest.' It is a mistaken assumption that this is a mere general reference to public welfare without any standard to guide determinations. The purpose of the Act, the requirements it imposes, and the context of the provision in question show the contrary. Going forward from a policy mainly directed to the prevention of abuses, particularly those arising from excessive or discriminatory rates, Transportation Act 1920 * * * was designed better to assure adequacy in transportation service. This Court, in New England Divisions Case, 261 U.S. 184, 189, 190, 43 S.Ct. 270, 273, 67 L.Ed. 605, adverted to that purpose, which was found to be expressed in unequivocal language: 'to attain it, new rights, new obligations, new machinery, were created.' The Court directed attention to various provisions having this effect, and to the criteria which the statute had established in referring to 'the transportation needs of the public,' 'the necessity * * * of enlarging (transportation) facilities,' and the measures which would 'best promote the service in the interest of the public and the commerce of the people.' Id. page 189, of 261 U.S., 43 S.Ct. 270, 273, 67 L.Ed. 605, note. See, also, Texas & Pacific Ry. Co. v. Gulf, Colorado & Santa Fe Ry. Co., 270 U.S. 266, 277, 46 S.Ct. 263, 70 L.Ed. 578. The provisions now before us were among the additions made by Transportation Act, 1920 [41 Stat. 456], and the term 'public interest' as thus used is not a concept without ascertainable criteria, but has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities, questions to which the Interstate Commerce Commission has constantly addressed itself in the exercise of the authority conferred. So far as constitutional delegation of authority is concerned, the question is not essentially different from that which is raised by provisions with respect to reasonableness of rates, to discrimination, and to the issue of certificates of public convenience and necessity. Intermountain Rate Cases, 234 U.S. 476, 486, 34 S.Ct. 986, 58 L.Ed. 1408; Railroad Commission v. Southern Pacific Co., 264 U.S. 331, 343, 344, 44 S.Ct. 376, 68 L.Ed. 713; Avent v. United States, 266 U.S. 127, 130, 45 S.Ct. 34, 69 L.Ed. 202; Colorado v. United States, 271 U.S. 153, 163, 46 S.Ct. 452, 70 L.Ed. 878; Chesapeake & Ohio Ry. Co. v. United States, 283 U.S. 35, 42, 51 S.Ct. 337, 75 L.Ed. 824."

The plaintiffs contend that the cases of Panama Refining Co. v. Ryan, supra, and Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 857, 79 L.Ed. 1570, 97 A.L.R. 947, present a "deadly parallel" upon the point of constitutionality to the case at bar. Both of the cases cited are clearly distinguishable, however. In the Panama Refining Company case, the power sought to be delegated to the President of the United States by Section 9 (c) of the National Industrial Recovery Act of 1933, 48 Stat. 200, was plainly a grant of legislative power, of policy making power. Nowhere in the National Industrial Recovery Act did Congress itself declare a legislative policy or express its legislative will upon the question of whether or not the transportation of petroleum in interstate commerce in excess of the amount permitted by State authority to be produced or withdrawn, should be prohibited. The Act instead authorized the President to prohibit such transportation but it did this without any expression of the policy or the will of Congress and without supplying any standards, rules or criteria. That Act required no findings, quasi-jurisdictional or otherwise, to be made by the Executive before the imposition of regulation by executive decree. Reference to the decision of the Supreme Court, 293 U.S. at page 415, 55 S.Ct. at page 246, 79 L.Ed. 446, will confirm this conclusion. Mr. Chief Justice Hughes stated: "Section 9 (c) does not state whether or in what circumstances or under what conditions, the President is to prohibit the transportation of the amount of petroleum or petroleum products produced in excess of the state's permission. It establishes no criterion to govern the President's course. It does not require any finding by the President as a condition of his action. The Congress in section 9 (c) thus declares no policy as to the transpor-

tation of the excess production. So far as this section is concerned, it gives to the President an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit. And disobedience to his order is made a crime punishable by fine and imprisonment."

In the case of Schechter Corporation v. United States, supra, the Supreme Court passed upon the constitutionality of a delegation of power to the President pursuant to Section 3 (a) of the National Industrial Recovery Act of 1933, 48 Stat. 196, which authorized the President to approve codes which should supply the standards of fair competition for the trades and industries to which they related. The violation of such codes was to be deemed unfair competition within the meaning of the Federal Trade Commission Act (Act of September 26, 1914, Chapter 311, 38 Stat. 717, 15 U. S.C.A. § 41 et seq.) and were to be punished as crimes against the United States. Mr. Chief Justice Hughes, delivering the opinion of the Supreme Court, stated, 295 U.S. at pages 541 and 542, 55 S.Ct. at page 848, 79 L.Ed. 1570, 97 A.L.R. 947: "To summarize and conclude upon this point: Section 3 of the Recovery Act * * is without precedent. It supplies no standards for any trade, industry, or activity. It does not undertake to prescribe rules of conduct to be applied to particular states of fact determined by appropriate administrative procedure. Instead of prescribing rules of conduct, it authorizes the making of codes to prescribe them. For that legislative undertaking, section 3 sets up no standards, aside from the statement of the general aims of rehabilitation, correction, and expansion described in section 1. In view of the scope of that broad declaration and of the nature of the few restrictions that are imposed, the discretion of the President in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country, is virtually unfettered. We think that the code-making authority thus conferred is an unconstitutional delegation of legislative power."

■ Section 203 (b) (8) of the Motor Carrier Act read in conjunction with the provisions of Section 202 and the light shed by the whole Act makes plain the intent of Congress to give to the Interstate Commerce Commission power to subject interstate and foreign transportation by motor carrier between contiguous or adjacent municipalities and zones commercially a part thereof to the regulatory provisions of the Act if such regulation is required in the public interest for the benefit of commerce. When the partial exemption is removed the carriers operating within the area are subject to precisely the same regulatory provisions as those operating elsewhere. Section 202 (a) sets forth with sufficient definiteness and clarity the requirements, the standards or criteria under which the partial exemption conferred by Section 203 (b) (8) may be removed. The Commission may remove the partial exemption if it is necessary to foster sound economic conditions in transportation among motor carriers and to avoid unjust discriminations and unfair and destructively competitive practices.

■ We are of the opinion that this phase of the case at bar is ruled by the decisions of the Supreme Court in the Intermountain Rate Cases, supra, and New York Central Securities Company v. United States, supra. We conclude therefore that Sections 202 and 203 (b) (8) of the Motor Carrier Act do not constitute an unconstitutional delegation of legislative power by Congress upon the Interstate Commerce Commission and are not in derogation of Sections 1 and 8 of Article I of the Constitution of the United States, U.S.C.A.

Has the Commission Made Such Quasi-Jurisdictional Findings as are Necessary to Support Its Order in the Light of the Act?

The Commission by the first part of its order states: "That, for the purpose of administration and enforcement of the Motor Carrier Act, 1935, the zone adjacent to and commercially a part of New York, N. Y., and contiguous municipalities in which transportation by motor vehicle in interstate or foreign commerce, not under a common control, management, or arrangement for a continuous carriage or shipment to or from a point beyond the zone, will be partially exempt under Section 203 (b) (8) of the act from regulation be, and it is hereby, defined to include the following territory: The area within the corporate limits of the cities of New York, Yonkers, Mount Vernon, North Pelham, Pelham, Pelham Manor, Great Neck Estates, Floral Park, and Valley Stream, N. Y., and Englewood, N. J.; the area within the borough limits of Alpine, Tenafly, Englewood Cliffs, Leonia, Fort Lee, Edge-

water, Cliffside Park, Fairview, Palisades Park, and Ridgefield Boroughs, Bergen County, N. J.; and that part of Hudson County, N. J., east of Newark Bay and the Hackensack River." It will be observed that this portion of the Commission's order undertakes to define the exempt zone prescribed by Section 203 (b) (8). Examination of the map which is set out as an appendix to this opinion will demonstrate that all of the areas named are either contiguous or adjacent to each other or are within zones contiguous or adjacent to the respective municipalities named in the order. We think that it may not be denied that what we may describe as the commercial integration of these municipalities and zones by reason of their location and common interests is a fact. To put this conclusion within the language employed by Congress in Section 203 (b) (8) of the Act, we state that the municipalities named in that portion of the Commission's order just quoted, with their contiguous or adjacent zones, are clearly a part of what may be described as the New York commercial zone.

The second portion of the order of the Commission, as we have stated, purports to remove the partial exemption created by Section 203 (b) (8) from certain other municipalities and zones which are contiguous or adjacent to those included by the Commission within the exempted zone. This portion of the Commission's order reads as follows: "It is further ordered, That the exemption in section 203 (b) (8), to the extent it affects transportation by motor vehicle between Elizabeth, Linden, and Perth Amboy, N.J., and that part of New Jersey east of U. S. Highway 9 extending southward from the city limits of Linden to the city limits of Perth Amboy, on the one hand, and points in the above-described zone, on the other, be, and it is hereby removed and that said transportation be, and it is hereby, subjected to all of the provisions of the Motor Carrier Act, 1935." An examination of the map heretofore referred to will show that by reason of the manner in which the Commission has drawn its lines the City of Newark as well as all other municipalities west of Newark Bay and the Hackensack River, not named by the Commission as lying within the exempt zone, are without that zone. For example, it will be observed that while Newark is not contiguous to New York or to the other municipalities included in the zone of par-

tial exemption, none the less it is adjacent to certain of these municipalities. Upon the other hand, Elizabeth, Linden, Carteret and Perth Amboy are contiguous to Staten Island or Richmond except for the Arthur Kill, crossed by two bridges and ferries.

In respect to part of the area removed from the partial exemption of Section 203 (b) (8) and in regard to the City of Newark the Commission stated in its first report, "Among the cities and towns which would be excluded from the commercial zone would be some, such as Elizabeth and Perth Amboy, for example, which are separated from Staten Island by Staten Island Sound or Arthur Kill only, and are therefore contiguous, in a sense, to the city of New York. Except for the relatively small amount of traffic, however, which moves between Staten Island and these points on the western shore of the Sound, the logical route for movement by motor vehicle from the remainder of the city of New York is through Newark, a point which we do not propose to include in the commercial zone, and is interterminal in character. In our opinion, therefore, these points along the western shore of the Sound are not within the area adjacent to and commercially a part of New York within the meaning of Section 203(b) (8)."

In our opinion the record before the Commission supports the conclusion stated that a comparatively small amount of traffic moves between Staten Island or Richmond and the points named on the western shore of Staten Island Sound and that the logical route for movement by motor vehicle from the remainder of the City of New York is through Newark.

Was it necessary and within the scope of the statute for the Commission to define an area of partial exemption as well as to remove the exemption from the municipalities and zones named? An examination of the statute convinces us that its terms must be construed in a practical manner and not technically. A municipality is a geographical unit and as such is capable of ascertainment. The transportation of property or passengers "wholly within a municipality" is plainly within the partial exemption conferred by Section 203 (b) (8). The descriptive phrase "contiguous municipalities" as used in the section can mean only municipalities whose borders are actually contiguous. These areas require no definition. The next phrase of the

section which relates to transportation "within a zone adjacent to and commercially a part of any such municipality or municipalities * * *" clearly requires definition by the Commission in order that it may be known how the partial exemption of the statute shall be applied to municipalities and zones which are not contiguous to other municipalities and zones. Admittedly, municipalities and zones, whether contiguous or not, may or may not be commercially a part of each other. This is true whether a fact-finding tribunal has so ascertained or whether there has been no ascertainment of facts whatsoever, but obviously the language of Section 203 (b) (8) requires the Commission to define municipalities and zones which are commercially a part of each other if the partial exemption conferred by the statute is to be in force. Such fact-finding is a necessity since otherwise a motor carrier operator would not know how to govern his operations. The Commission, we think quite properly, has determined the zone of partial exemption and has acted within the power conferred upon it by Congress.

As to the municipalities and zones excluded from the partial exemption of the Act by order of the Commission, we state, as we have stated heretofore, that the Commission possessed the power to effect the exclusion. The position urged by some of the parties to the effect that the partial exemption conferred by the Act cannot be reviewed by the Commission is untenable. For example the fact that Perth Amboy, Carteret, Linden and Elizabeth are contiguous to Staten Island or Richmond does not confer absolutely the partial exemption of the statute upon them in their relation to Staten Island or Richmond as a commercial part of that municipality. The language of Section 203(b) (8) is clearly to the effect that as the Commission may "* * * from time to time find that such application (the application of the regulatory provisions of the Act to partially exempt areas) is necessary to carry out the policy of Congress * * *" it may apply the regulatory provisions of the Act to such partially exempt areas. Moreover, as we have indicated heretofore in respect to notice, there is no substantial difference between definition by the Commission of the areas of partial exemption and the removal of partial exemption as to contiguous or adjacent municipalities which are not commercially a part of each other. The former may be and are included with-

in the partial exemption of the statute by the definition of the Board; the latter may be and are excluded by order. The distinction between the word "defined" and the word "ordered" under the circumstances of the case at bar is immaterial. The substantial questions remaining for our determination therefore are only two in number; first, has the Commission made the necessary jurisdictional findings, and, second, were such findings supported by the evidence before the Commission?

The Commission's ultimate finding and conclusion is expressed as follows in its first report, "We find that the zone *adjacent to and commercially a part of New York, N. Y., and contiguous municipalities* in which transportation by motor vehicle in interstate or foreign commerce, not under a common control, management, or arrangement for a continuous carriage or shipment to or from a point beyond the zone, is at present partially exempt from regulation under Section 203 (b) (8) consists of the following * * *". Then follows the enumeration of the municipalities and zones deemed by the Commission to be within the area of partial exemption. We have italicized the words of particular importance in the above quotation.

In respect to its ultimate finding and conclusion, the Commission stated in its first report: "The exemption provided in Section 203 (b) (8) applies to transportation between contiguous municipalities 'unless and to the extent' we find that the application of all the provisions of the act is necessary to carry out the policy of Congress enunciated in section 202 (a). We believe that that policy requires that the regulatory provisions of the act should, in general, be applied to interterminal transportation and that where * * * two cities are contiguous in the sense that their boundaries join at some place but are not part of a single terminal there should be no exemption."

In its second report, No. MC-C-2, the Commission amplifies the basis of its conclusions. Beginning with the statement that the purpose of the proceedings was "* * * to fix the limits of the 'zone adjacent to and commercially a part of' a certain municipality, such determination being necessary in the administration of Section 203 (b) (8) * * *", the Commission goes on to state that the statute was designed "* * * for adequate Federal regulation of motor carriers."

The Commission also said that a "zone adjacent to and commercially a part of" New York City for the purposes of port operations in trans-Atlantic, coastal and intercoastal commerce by water, may be very different from a zone for motor carrier operations intended by Congress to be subjected to Federal regulation. The Commission then states as the ratio decidendi of its decision that it is persuaded that " * * * the purpose of exemption in section 203 (b) (8) was to remove from Federal regulation operations which, although in interstate or foreign commerce, were nevertheless of a local or urban type which we termed 'intraterminal' (in the first report) as distinguished from intercity of intercommunity operations." By its first report the Commission designated the type last referred to as "interterminal" transportation. The Commission states that such an interpretation may be based upon the language of clause 8 as transportation of passengers or property in interstate or foreign commerce "wholly within a municipality or between contiguous municipalities or within a zone adjacent to and commercially a part of any such municipality or municipalities", stating in effect that the framers of the Act had clearly in mind to afford the partial exemption of the statute to urban transportation, viz., intraterminal transportation as distinguished from interterminal transportation. The plaintiffs contend that such an interpretation is at variance with the words employed in Section 202 and Section 203 (b) (8) and that therefore the Commission has applied a test to the statute not justified by the words employed by Congress. Therefore, say the plaintiffs, the Commission cannot sustain the necessary and ultimate quasi-jurisdictional finding upon which its order is based.

The purpose of the Motor Carrier Act, as we have stated, is the regulation of interstate and foreign motor carrier transportation. Section 203 (b) (8) merely sets forth the basis for partial exemption. The Commission has found in effect that the regulation of interstate and foreign motor carrier transportation in the interests of commerce requires the removal of the partial exemption between contiguous and adjacent municipalities or zones. Such a finding, if not made in express terms by the Commission, must none the less be deemed to be implicit in what it has stated; indeed we think it is expressed in the ultimate finding which we have quoted. The Commission need not do more. See United States v. Baltimore & Ohio R. Co., 293 U.S. 454, 464, 465, 55 S.Ct. 268, 79 L.Ed. 587, and the cases therein cited. While Congress created areas or zones of partial exemption by the provisions of Section 203 (b) (8), it is obvious that Congress did not intend them to be continued in existence if transportation by motor vehicle through and to them, though between contiguous or adjacent municipalities or zones, was not in the nature of intraterminal or urban cartage between localities commercially integrated and would work damage to interstate or foreign commerce. The power to remove the partial exemption was vested by Congress in the Commission as a remedy for such damage. The Commission therefore makes a distinction, and we think that it is a logical one, between purely local or urban cartage, which it designates as "intraterminal" in character and cartage of a kind not urban or local and not between municipalities or zones commercially a part of one another, viz., "interterminal" transportation. We think that this construction of the statute is correct and is one justified by the established rules of statutory construction. Moreover, the Commission goes further and specifically applies its ruling to particular municipalities.

For example, the Commission states that it does not deem transportation by motor vehicle between New York and contiguous municipalities, on the one hand, and points in New Jersey, west of the Hackensack River, Newark Bay and Staten Island Sound, on the other hand, to be intraterminal in character. It finds further that in New York State the commercial zone does not extend north or east of the municipalities contiguous to New York City. Looking to the west it has limited the commercial zone in the manner we have indicated heretofore.

It must be borne in mind that there is a distinction in law between quasi-jurisdictional findings which are indispensable and a complete statement of the grounds upon which the Commission reaches its determination. See United States v. Baltimore & Ohio R. Co., supra. The Commission might well have amplified the grounds upon which it based its conclusions. Indeed it endeavored to do so by its second report. None the less in our opinion the Commission made the indispensable quasi-

jurisdictional finding which we have quoted above. That finding is sufficient in form and substance and the contentions of the plaintiffs to the contrary are not well founded. See United States v. Louisiana, 290 U.S. 70, 80-82, 54 S.Ct. 28, 78 L.Ed. 181; Georgia Public Service Comm. v. United States, 283 U.S. 765, 773, 51 S. Ct. 619, 75 L.Ed. 1397; Alabama v. United States, 283 U.S. 776, 779, 51 S.Ct. 623, 75 L.Ed. 1406; Ohio v. United States, 292 U.S. 498, 511, 54 S.Ct. 792, 78 L.Ed. 1388; Florida v. United States, 292 U.S. 1, 8–11, 54 S.Ct. 603, 78 L.Ed. 1077; United States v. American Sheet & Tin Plate Co., 301 U.S. 402, 406, 407, 409, 57 S.Ct. 804, 81 L.Ed. 1186.

### Are the Findings of the Commission Supported by the Evidence?

The plaintiffs take the position that there is no scintilla of evidence which supports the ruling of the Commission removing the statutory exemption from the municipalities of Elizabeth, Newark, Linden, Carteret or Perth Amboy. This contention cannot be sustained. The hearings before the examiner consumed four days and the evidence then received demonstrated a confusion upon the part of those interested as to what was or should be deemed to be the area of statutory exemption in the New York City commercial zone. Various zones were contended for by various proponents. It was the duty of the Commissioner to define the zone. Lacking such definition conditions of transportation by motor vehicle, already confused, would become chaotic.

■ The record before the Commission sufficiently demonstrates the fact that a comparatively small amount of cartage by motor vehicle takes place between Perth Amboy, Carteret, Linden and Elizabeth upon one hand and Richmond or Staten Island upon the other and that much the greater bulk of such transportation proceeded to the four municipalities first named via the City of Newark. We also think that the evidence before the Commission sustains the conclusion that Newark is a municipality distinctly separated commercially from New York City, possessing its own manufacturing centers, shipping facilities and suburbs. It was therefore proper for the Commission to exclude this municipality from the area of partial exemption. The Commission was forced to consider the situation as a whole and in the light of all the evidence. The oral testimony and the twenty-six documentary exhibits introduced in evidence furnish adequate support for the conclusions and the order of the Commission. What we have said in respect to the exclusion of the municipalities named is true also of those areas included in the Port of New York Authority and now excluded from partial exemption by order of the Commission as appears from the map attached as an appendix. This court, however, upon the pleadings is concerned solely with the removal of the partial exemption upon motor vehicle transportation between points in the City of New York upon the one hand and Elizabeth, Linden, Carteret and Perth Amboy upon the other and the definition of the area of partial exemption by the Commission in such wise that the City of Newark is excluded therefrom.

■ It is not within the province of this court to consider the weight of evidence nor the wisdom of the order entered by the Commission. Our duty is limited to ascertaining whether or not the order made was made in accordance with due form of law and upon adequate evidence. See Virginian Ry. Co. v. United States, 272 U.S. 658, 663, 47 S.Ct. 222, 71 L.Ed. 463; New England Divisions Case, 261 U.S. 184, 204, 43 S.Ct. 270, 67 L.Ed. 605. As was stated by the Supreme Court in Interstate Commerce Comm. v. Louisville & Nashville R. Co., 227 U.S. 88, 100, 33 S.Ct. 185, 190, 57 L.Ed. 431, the order of the Commission is not arbitrary but is " * * * sustained by substantial, though conflicting, evidence. The courts cannot settle the conflict, nor put their judgments against that of the rate-making body * * *".

### As to the Testimony Offered by the Plaintiffs at the Hearing before This Court.

■ Certain testimony was offered on behalf of the plaintiffs to endeavor to show that their operations were exempt by reason of the express provisions of Section 203 (b) (8) of the Motor Carrier Act. We admitted such testimony subject to a motion to strike made by the defendants at the trial and it was stated by us that if the court determined that this evidence was not pertinent to the issues presented, it would be stricken from the record. Upon this issue the plaintiffs contend that the question of what transportation shall be deemed to be within the exemption conferred by Section 203 (b) (8), unaffected by an order of the Commission, is a mixed question

of fact and law for decision only by the courts, citing in support of their position United States v. Idaho, 298 U.S. 105, 109, 56 S.Ct. 690, 80 L.Ed. 1070; Piedmont & Northern R. Co. v. Interstate Commerce Commission, 286 U.S. 299, 52 S.Ct. 541, 76 L. Ed. 1115, and other similar decisions. The position so taken by the plaintiffs may be sustained only by the conclusion that clause 8 confers a statutory exemption absolute which cannot be altered or abridged by the Commission in respect to transportation "wholly within a municipality or between contiguous municipalities." We have dealt heretofore with this contention and have rejected it. If it were accepted, the result would be that transportation by motor vehicle between the respective contiguous municipalities of Elizabeth, Linden, Carteret, Perth Amboy and Richmond or Staten Island could not be subjected by order of the Commission to the regulatory provisions of the Act. But such a conclusion, as we have stated heretofore, cannot be sustained upon the language of Section 203 (b) (8). It follows therefore that the evidence offered by the plaintiffs as to the nature of their operations between Elizabeth, Linden, Carteret and Perth Amboy on the one hand, and Staten Island or Richmond upon the other, contiguous communities, cannot be received in the case at bar. We may not receive evidence to the end that we ourselves may determine the area of statutory exemption within the meaning of Section 203 (b) (8). Such a determination is within the province of the Commission. The judicial review which is afforded by the proceeding at bar is the testing of the validity of the order of the Commission upon the evidence which was before the Commission at the time of its hearings. If the rule were otherwise, as stated by the Supreme Court in United States v. Louisville & Nashville R. Co., 235 U.S. 314, 321, 35 S.Ct. 113, 114, 59 L.Ed. 245 " * * * the Commission would become but a mere instrument for the purpose of taking testimony to be submitted to the courts for their ultimate action." As we have indicated, the partial exemption conferred by Section 203 (b) (8) is not absolute, but like the prohibition under Section 4 of the Interstate Commerce Act, construed by the Supreme Court in the Intermountain Rate Cases, supra, the ultimate administrative determination of the application of the section must be left to the Commission. The evidence referred to offered this court by the plaintiffs as in

a proceeding de novo can have no other purpose than to compel a determination by the court of a matter administrative in character and therefore beyond our province.

In Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524, a suit was brought under Section 316 of the Act of August 15, 1921, c. 64, §§ 301–316, 42 Stat. 159, the Packers and Stockyards Act, 7 U.S.C.A. § 201 et seq., to enjoin an order made by the Secretary of Agriculture purporting to prescribe reasonable rates and charges for certain marketing agencies. By Section 316 of the Packers and Stockyards Act the provisions of the Urgent Deficiencies Act, as in the case at bar, authorize proceedings brought by parties in interest to restrain and annul orders of the Secretary of Agriculture. The Supreme Court, holding that certain evidence introduced before the statutory court (see D.C., 29 F. 2d 750) was improperly admitted, stated 280 U.S. at page 443, 50 S.Ct. at page 226, 74 L.Ed. 524, of its opinion: "A proceeding under section 316 of the Packers and Stockyards Act is a judicial review, not a trial de novo. The validity of an order of the Secretary, like that of an order of the Interstate Commerce Commission, must be determined upon the record of the proceedings before him—save as there may be an exception of issues presenting claims of constitutional right * * *". The decision of the Supreme Court in the Tagg Bros. & Moorhead case is apt to the circumstances of the case at bar and, we think, requires the exclusion of the evidence subject to the motion to strike. We might add that in the case at bar the only constitutional question involved is whether the Motor Carrier Act itself by the provisions of Section 203 (b) (8) delegates a lawmaking power to the Commission. This question has been resolved by a consideration of the statute itself and evidence may not be received by us upon such an issue.

The fourth prayer of the plaintiffs' petition seeks to have this court render a declaratory decree defining the status of the plaintiffs' operations between Newark and the City of New York. This is a prayer for a declaratory judgment pursuant to the provisions of the Act of March 3, 1911, c. 231, Section 274d, as added June 14, 1934, c. 512, 48 Stat. 955, as amended Aug. 30, 1935, c. 829, § 405, 49 Stat. 1027, 28

U.S.C.A. § 400. We state that that Act has no application to the circumstances of the case at bar and therefore cannot serve to enlarge the issues upon which evidence may be offered by the plaintiffs. We understand, however, that the plaintiffs do not now press for the granting of such relief.

Accordingly, the motion of the defendants to strike certain evidence offered by the plaintiffs is granted.

In view of all of the foregoing the petition must be dismissed.

We file herewith findings of fact and conclusions of law.