**S. S. KRESGE COMPANY,
Plaintiff-Appellee,**

v.

**A & B TRANSFER, INC., et al.,
Defendants-Appellants.**

**No. 72-1967.**

United States Court of Appeals,
Sixth Circuit.

Argued April 10, 1973.

Decided Dec. 5, 1973.

Certiorari Denied March 4, 1974.
See 94 S.Ct. 1491.

Arthur R. Hauver, Denver, Colo., for defendants-appellants; Alvin J. Meiklejohn, Jr., of Jones, Meiklejohn, Kehl & Lyons, Denver, Colo., Walter N. Bieneman, Robert D. Schuler and John W. Ester of Matheson, Bieneman, Veale & Parr, Detroit, Mich., on brief.

William B. Thompson, Troy, Mich., for plaintiff-appellee.

Before PECK, McCREE and MILLER, Circuit Judges.

JOHN W. PECK, Circuit Judge.

This is an appeal from an order granting summary judgment in favor of the plaintiff-shipper, S. S. Kresge, in an action against A & B Transfer, Inc., and a number of other motor carriers engaged in interstate commerce. In the District Court, Kresge sought enforcement of an Interstate Commerce Commission refund order, upheld by a three-judge district court in Admiral-Merchants Motor Freight, Inc. et al. v. United States and the Interstate Commerce Commission, 321 F.Supp. 353 (D. Colo.1971), aff'd mem., 404 U.S. 802, 92 S.Ct. 51, 30 L.Ed.2d 37 (1971), reh. denied, 404 U.S. 987, 92 S.Ct. 443, 30 L. Ed.2d 371 (1971). It alleged that the decision in *Admiral-Merchants, supra,* was res judicata on all issues except the amount of damages. Because of the complexity of this case, we set out the facts in some detail.

The defendants-appellants, all motor carriers in interstate commerce, are members of the Middlewest Motor Freight Bureau [1] and participate in its published tariffs. In early 1968 the Bureau published new rates to be effective in thirty days.[2] Initially, the Commission raised no objection to the increased rates and allowed them to take effect on

---

1. The Middlewest Freight Bureau is a rate publishing agent for interstate motor carriers having regular routes and which operate in the middle western states. The Bureau also compiles statistical data which are presented to the ICC in support of tariff changes.

2. Section 217 of the Interstate Commerce Act, 49 U.S.C. § 317(c), requires interstate motor carriers to notify the Commission 30 days prior to any change in rates. The ICC may then allow the rates to take effect without objection, allow the rates to take effect but order a hearing on their lawfulness, or suspend the rates for up to seven months and in the interim hold a hearing on the lawfulness of the rates. 49 U.S.C. § 316(g).

April 1, 1968. But after receiving complaints from shippers, the Commission scheduled a hearing on the lawfulness of the rates for May 20, 1968. The Department of Transportation and the General Services Administration, both of which had opposed the rate increases, requested that the Commission postpone the hearing for ninety days so that each agency could adequately prepare for the proceedings. The carriers later joined in that request.

The Commission by its order of April 25, 1968, granted the request but conditioned the extension on the agreement of the carriers to comply with a refund provision:

"It is further ordered, That the time for filing the requested information and supporting data be, and, it is hereby extended to August 5, 1968; that the hearing be, and, it is hereby postponed to August 19, 1968, conditioned upon respondents compliance with the refund provision ordered below * * *.

"And it is further ordered, That respondents be and, they are hereby, ordered to make refunds to the shippers on any shipment moving after May 20, 1968, to the extent that the increases or any portion thereof under investigation herein are not approved by the Commission."

On May 1, 1968, the carriers petitioned the Commission to reconsider the refund portion of the order of April 25, and raised several objections to its legality. However, the carriers later withdrew their objections, apparently because they needed the ninety-day extension to compile the necessary data for the hearing. Admiral-Merchants Motor Freight, Inc. v. United States, supra, at 356. As a result, the order of April 25 stood without protest. The Commission held the hearing on August 19, 1968, and issued its findings on June 5, 1969. It found that the carriers had not shown the increased rates to be "just and reasonable," ordered them cancelled and:

"further ordered, That, in accordance with the order entered herein on April 25, 1968, the respondents be, and they are hereby, required to refund to shippers the charges on shipments moving after May 20, 1968, to the extent that such charges included the increases herein found not shown to be just and reasonable."

The Bureau then petitioned the Commission either to vacate or reconsider its refund order or to reopen the proceedings for a further hearing. At the same time that the carriers notified the Commission that they would cancel the disputed rates as of August 31, 1969, they also gave the Commission notice of new increased rates to take effect on September 1, 1969. On August 29, 1969, the Commission declined to suspend or investigate the new increases and also denied the carriers' petition to reconsider the refund order. Furthermore, the Commission ordered:

"that the respondents will hereinafter, in accordance with the said decision of June 5, 1969, make refund to shippers presenting their claims to the carriers supported by paid freight bills or other appropriate evidence." I.C.C. Docket No. 34,971, Order of August 29, 1969.

Finally, on October 27, 1969, the Commission denied the carriers' second petition for reconsideration of the refund order.

The carriers then sought an injunction against enforcement of the refund order. (See Interstate Commerce Act, §§ 17(9) & 205(h), 49 U.S.C. §§ 17(9) & 305(h) ). A three-judge district court was empaneled to hear the case pursuant to 28 U.S.C. §§ 2325 and 2284. (Admiral-Merchants, supra.)

The three-judge district court found that although the refund order was valid, it was nevertheless not based on the Commission's statutory authority, but rather constituted a procedural device— a condition which the Commission could lawfully append to its grant of a post-

ponement of the hearing. Since the carriers had impliedly agreed to this procedure—by withdrawing their objections —they were estopped from later contesting the validity of the order:

"It is abundantly clear, therefore, that Congress has not authorized the Commission to order refunds as a generally accepted procedure. It is also clear, however, that the Commission did not undertake to exercise any such power nor is this a reparations proceeding such as that which was condemned in the T.I.M.E. case. Indeed, we do not view the present action of the Commission as an effort to exercise any general authority. The order in question was instead issued incident to a request for a continuance and indeed was not unlike the exercise of the suspension power which the Commission has and had under 49 U. S.C. § 316(g). No doubt the Commission could have ordered the rates suspended at least for a period of time (seven months).

"An even stronger argument for refusal to annul the Commission's order is the doctrine of equitable estoppel. We have in mind the principle which imposes an obligation on a person to live up to his representations or conduct in circumstances where inequitable consequences would result to persons having the right to rely, and who in good faith did rely on the representations made. Applied to the case at bar the Commission certainly relied on the carriers' withdrawal of their jurisdictional objection to the refund condition. The Commission's reliance was evidenced by its failure to vacate the order. It did not have to anticipate that the carriers would renege. The carriers' withdrawal of their timely objection was a positive act which evidenced willingness to go along with the condition imposed.

"We are unable in good conscience, in view of the circumstances presented, to annul the order of the Commission. The Commission was acting in good faith in granting the extension,

and the carriers were at the time agreeable to acceptance of the benefits of such an extension order. Their present posture appears to us to be grossly inequitable and not deserving of court intervention. While we do not commend the procedure as one which should be or could be practiced, we do hold that the peculiar facts of this case, arising as they did, are such as to not justify the granting of the relief requested, namely annulment of the Commission's order and approval of the carriers' conduct." [Footnotes omitted.] 321 F.Supp. at 359–360.

The present action for refunds was brought by Kresge against those members of the Middlewest Motor Freight Bureau with whom it did business between May 20, 1968, and June 5, 1969. Kresge moved for summary judgment, contending that since the Supreme Court had affirmed the opinion of the three-judge district court, nothing remained for the District Court here but to order enforcement and determine the amount of damages. The District Court found no "significant or material factual disputes" between the parties, granted the motion for summary judgment, citing *Admiral-Merchants* as res judicata on the question of whether the cause of action asserted by the plaintiff properly entitled it to the relief sought. As a result the defendants were ordered to examine the plaintiff's freight invoices and make a refund in accordance with the ICC order of June 5, 1969. The present appeal by the defendant carriers is from that order.

To resolve the instant appeal we turn to a recent Seventh Circuit case which resolved similar appeals before it regarding enforcement proceedings founded on the same Colorado three-judge district court's judgment and affirmed those cases in favor of the plaintiff-shipper by holding that the shipper did have a statutory cause of action under §§ 16(2) and 205(g) of the Interstate Commerce Act, 49 U.S.C. §§ 16(2) and 305(g). Aluminum Company of America v. Admiral Merchants Motor Freight,

Inc., 486 F.2d 717 (7th Cir. 1973). We are persuaded by that Court's opinion and adopt its reasoning as dispositive of the issues presented by the appeal before us.

Accordingly, the judgment of the District Court is affirmed.

WILLIAM E. MILLER, Circuit Judge (dissenting).

Respectfully, I must dissent. The Interstate Commerce Act, as originally passed in 1887, established a scheme for the regulation of the nation's railroads. 24 Stat. 379. In 1935 the Act was amended to give the Commission regulatory authority over motor carriers as well. 49 Stat. 543. At the time of the 1935 amendment, Congress labeled the sections regulating railroads as Part I,

49 U.S.C. §§ 1 et seq., and the sections regulating motor carriers as Part II, 49 U.S.C. §§ 301 et seq. Though many sections of Parts I and II are parallel, there are significant differences, particularly with reference to the private remedies available to shippers.

Part I provides for both refunds, § 15(7), 49 U.S.C. § 15(7), and reparations,[1] §§ 13 and 16, 49 U.S.C. §§ 13 and 16. Part II, on the other hand, contains no statutory refund procedure and was only recently amended (in 1965) to permit reparations. Interstate Commerce Act § 204a,[2] 79 Stat. 651, 49 U.S.C. § 304a. Moreover, the remedies of the shipper seeking reparations under § 204a are more limited than those available under its Part I counterpart, § 16(2).[3] For example, only § 16(2) per-

---

[1]. "Refunds" and "reparations", as they are used in the Interstate Commerce Act, are words of art. Under § 15(7), 49 U.S.C. § 15(7) the Commission may require a carrier which has increased its rates to keep accurate accounts of "all amounts received by reason of such increase." After the hearing the Commission may order the carrier "to *refund*, with interest, to the persons in whose behalf such amounts were paid, such portion of the increased rates or charges as by its decision shall be found not justified." (Emphasis added).

Under the reparations procedure any aggrieved party may make a complaint to the ICC "of anything done or omitted to be done by any common carrier subject to the provisions of this chapter . . . ." 49 U.S.C. § 13(1). The Commission may then investigate and, if it finds a violation by the carrier, it will "make an order directing the carrier to pay to the complainant the sum to which he is entitled on or before a day named." 49 U.S.C. § 16(1). There are a number of illegal activities that will give rise to a complaint for reparations, including: unreasonable charges, Lewis-Simas-Jones Co. v. Southern Pac. Co., 283 U.S. 654, 51 S.Ct. 592, 75 L.Ed. 1333 (1931), and discrimination by a carrier against or in favor of certain shippers, Pennsylvania R. Co. v. Weber, 257 U.S. 85, 42 S.Ct. 18, 66 L.Ed. 141 (1921).

2. Sec. 204a reads in pertinent part:
(2) For recovery of reparations, action at law shall be begun against common carriers by motor vehicle subject to this chapter within two years from the time the cause of action accrues, and not after,

and for recovery of overcharges, action at law shall be begun against common carriers by motor vehicle subject to this part within three years from the time the cause of action accrues, and not after, subject to paragraph (3) of this section, except that if claim for the overcharge has been presented in writing to the carrier within the three-year period of limitation said period shall be extended to include six months from the time notice in writing is given by the carrier to the claimant of disallowance of the claim, or any part or parts thereof, specified in the notice.
    *    *    *    *    *    *
(5) The term "reparations" as used in this section means damage resulting from charges for transportation services to the extent that the Commission, upon complaint made as provided in section 316(a) of this title, finds them to have been unjust and unreasonable, or unjustly discriminatory or unduly preferential or unduly prejudicial.

3. Sec. 16(2) reads as follows:
If a carrier does not comply with an order for the payment of money within the time limit in such order, the complainant, or any person for whose benefit such order was made, may file in the district court of the United States for the district in which he resides or in which is located the principal operating office of the carrier, or through which the road of the carrier runs, or in any State court of general jurisdiction having jurisdiction of the parties, a complaint setting forth briefly the causes for which he claims damages,

mits a successful plaintiff to recover attorney's fees. Although the original purpose of § 16(2) was to provide a right of action for shippers by railroad to obtain reparations, T.I.M.E. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959), the language of the section is broad and refers to "an order for the payment of money."

The appellees argue that the cause of action granted by § 16(2) to any person for whose benefit the Commission has ordered the payment of money is incorporated into Part II of the Act by § 205(g).[4] Therefore, since the refund order of June 5, 1969, was a final order under Part II, the beneficiaries of that order should have a cause of action for enforcement under § 16(2). In response, appellants contend, firstly, that the United States Supreme Court in T.I.M.E. v. United States, *supra*, held that § 16 was not applicable to the Motor Carrier Act and, secondly, that no action since that time, either judicial or legislative, has altered that holding.

In T.I.M.E. an interstate shipper contended that the rates it paid, even though in accordance with the published tariffs, were unreasonable because the through rate exceeded the sum of the rates charged for the shorter trips along the route. Two theories were advanced by the shipper: first, it was argued that the statutory duty of a motor carrier to establish reasonable rates, Interstate Commerce Act §§ 216(b), (d), 49 U.S.C. §§ 316(b), (d), implies a private right of action for those persons damaged by unreasonable rates; and second, that the Act preserves the common law action for the recovery of exorbitant rates charged by common carriers. Un-

der both theories the question of the reasonableness of the rates would be referred to the Interstate Commerce Commission.

The Supreme Court rejected both theories. What the shippers requested through their alleged statutory cause of action was, in effect, reparations—a remedy expressly provided for in Part I but not then in Part II:

> The very provisions of Part I, and their counterparts in Part III, which give a right of action to shippers against carriers for damages incurred by carrier violations of the Act and provide the mechanics for the enforcement of that right are conspicuously absent in the Motor Carrier Act. Thus, where § 8 of Part I provides that "any common carrier subject to the provisions of this chapter [who] shall do . . . any act . . . in this chapter . . . declared to be unlawful . . . shall be liable to the person or persons injured thereby for the full amount of the damages sustained . . .," Part II has no comparable provision. Again, whereas § 9 of Part I gives an injured shipper the right to sue in the I.C.C. or in the Federal District Court, Part II contains no comparable provision. *In addition, §§ 13(1) and 16 of Part I give a shipper claiming reparation the right to proceed in the Commission and to enforce his reparation award in the courts, and Part II contains no comparable provisions.* 359 U.S. at 470–471, 79 S.Ct. at 908 (emphasis added).

The Court decided that these omissions manifested Congress's intent not to provide shippers by motor carrier all of the

---

and the order of the Commission in the premises. Such suit in the district court of the United States shall proceed in all respects like other civil suits for damages, except that on the trial of such suit the findings and order of the Commission shall be prima facie evidence of the facts therein stated, and except that the plaintiff shall not be liable for costs in the district court nor for costs at any subsequent stage of the proceedings unless they ac-

crue upon his appeal. If the plaintiff shall finally prevail he shall be allowed a reasonable attorney's fee, to be taxed and collected as a part of the costs of the suit.

4. Sec. 205(g) provides:
   Any final order made under this chapter shall be subject to the same right of relief in court by any party in interest as is now provided in respect to orders of the Commission made under chapter 1 of this title.

remedies enjoyed by railroad shippers. Further support for this conclusion was seen by the Court in consistent rejection by the Congress of legislation that would have added to Part II sections similar to 8, 9, 13 and 16. 359 U.S. at 471–472, 79 S.Ct. 904.

No common law action for recovery of unreasonable rates was found to survive adoption of the Motor Carrier Act because such a remedy would have been inconsistent with the statute. Since the question of whether the rates were unreasonable would have to be referred to the Commission, *see* Texas & Pacific R. C. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), a common law action for recovery would have permitted in two steps what Congress prohibited in one.

The import of T.I.M.E. to the present case is apparent. The Supreme Court found that the remedies available to shippers by rail under § 16(2) were not present in the Motor Carrier Act. Consequently, any suggestion that § 16(2) is incorporated into Part II must fail unless, subsequent to the decision, Congress has provided for such incorporation.

I am aware that the Seventh Circuit in Aluminum Company of America v. Admiral Merchants Motor Freight, Inc., 486 F.2d 717 (7th Cir. 1973) and district courts in the Eighth Circuit, *see* Land O'Lakes, Inc. v. United-Buckingham Freight Lines, Inc., 351 F.Supp. 102 (D.Minn.1972); Western Electric Co. v. Burlington Truck Lines, No. 18,471–4 (W.D.Mo. March 6, 1973), have considered claims brought by shippers to enforce the ICC order of June 5, 1969 and have held that the shippers do have a statutory cause of action under §§ 16(2) and 205(g). These decisions have attempted either to distinguish *T.I.M.E.*

or hold it inapplicable in light of Congress having added a reparations section to Part II.

As indicated, in 1965 the Motor Carrier Act was amended by adding § 204a, thereby giving shippers by motor carrier a cause of action for reparations. There is no doubt that Congress was cognizant of the T.I.M.E. decision, and that the decision was one of the factors that finally prompted the Congress to make an addition to the Act that the Commission had long requested.[5] *See* 2 U.S.Code Cong. & Admin.News, p. 2931 (1965). But Congress did not choose to add this remedy by incorporating into Part II sections of Part I. Instead, it added to Part II a distinct section on reparations —one that is considerably more limited in scope than its Part I counterpart, § 16(2). T.I.M.E. was, therefore, left undisturbed in its holding that § 16 could not be read into Part II. On the contrary, Congress's action would suggest that § 204a is the sole remedy under Part II for the enforcement of Commission orders for the payment of money.[6]

In Aluminum Company of America v. Admiral Merchants Motor Freight, Inc., *supra*, the court found T.I.M.E. "clearly distinguishable since it involved the shippers' right to reparations not their right to enforce a valid refund order." 486 F.2d at 721. It is true that in T.I.M.E. the Court did not have before it a valid order of the Commission; however, it considered the broad question of what remedies were available under Part II and used unequivocal language in stating that the remedies of § 16 were not contained in Part II.

Unfortunately, there is no clear legislative history demonstrating the intent of Congress when it passed § 205(g) as a part of the original Motor Carrier Act in 1935. Senator Wheeler, Chairman of

---

5. Both before and after the T.I.M.E. decision the Interstate Commerce Commission has consistently requested that Congress amend the Motor Carrier Act and provide in Part II the broad remedies for reparations and refunds already present in Part I. See Hearings on S.1310 before the Senate

Comm. on Interstate Commerce, 76th Cong., 1st Sess. at 130 (1939); 76 Annual Report of I.C.C. to Congress 203, 204 (1962).

6. Kresge does not contend that it is entitled to reparations under § 204a, nor has it followed the procedure set forth in the statute for obtaining reparations.

the Senate Interstate Commerce Committee, simply pointed out the language of the section when he described the entire bill to the Senate. 79 Cong.Rec. 5653 (1935). Had Congress desired to incorporate into the Motor Carrier Act the broad statutory remedies under § 16(2), it is reasonable that there would have been some specific explanation of what was intended. Appellants submit that by "relief" in § 205(g), Congress meant "judicial review." See Charles Nolding Trucking Co. v. United States, 29 F.Supp. 537, 543 (D.N.J.1939). It is a plausible explanation, though certainly not conclusive. I only know that nothing in the Act itself, its legislative history, or its subsequent interpretation by the Supreme Court persuades me that Congress incorporated § 16 into the Motor Carrier Act via § 205(g). On that issue T.I.M.E. is as valid today as it was in 1959.

Finally, it is important to note that the refund order which the shippers are attempting to enforce did not stem from any statutory power of the Commission. Instead, principles of equitable estoppel and waiver were invoked to uphold its validity. Admiral-Merchants Motor Freight v. United States, *supra*. Nor has it been suggested that the Commission has the statutory authority under Part II to order refunds. In fact, with the exception of § 204a which has its own provisions for enforcement, Part II does not even hint that the ICC may make an order for the payment of money. What the majority has done, therefore, is to breathe into Part II a statutory cause of action to enforce an ICC order which was not issued pursuant to "any general authority." Admiral-Merchants Motor Freight, Inc. v. United States, *supra* at 359 of 321 F.Supp. Such a remedy certainly was not anticipated by Congress and this Court should leave to that body the determination of whether the rights and remedies of carriers and shippers under the Motor Carrier Act are to be changed.

The absence of a statutory cause of action would not necessarily leave the shippers without a remedy. The equitable doctrine of restitution seems a more appropriate vehicle for enforcing an order based on waiver and equitable estoppel. The courts of common law and equity have spent centuries fashioning remedies for injustice, and it is to that body of law that the shippers should have turned.[7] By creating a statutory cause of action for the appellees, this Court may have opened a Pandora's box that could be difficult to close.

---

7. Such remedies could be sought in federal court if diversity of citizenship existed; otherwise, in an appropriate state court.