Virgil CAROTHERS, Member and Representative of a Class of Certain Employees of the Western Transportation Co., Plaintiff,

v.

WESTERN TRANSPORTATION COMPANY, Defendant.

No. RI–CIV–75–0015.

United States District Court, S. D. Illinois, N. D.

May 19, 1976.

---

Walter D. Braud, Rock Island, Ill., for plaintiff.

Virgil Bozeman, Moline, Ill., Charles R. Sprowl, Chicago, Ill., for defendant.

## DECISION AND ORDER

ROBERT D. MORGAN, Chief Judge.

Plaintiff, Virgil Carothers, filed this complaint on behalf of himself and on behalf of all members of a class therein described. The court's jurisdiction is invoked under the provisions of 28 U.S.C. § 1336(a), involving Interstate Commerce Commission orders.

The litigation proceeds from the following operative facts. Defendant, a Delaware corporation, with its principal office in the State of Illinois, is an interstate carrier of commodities by motor vehicle. The plaintiff class, as defined in this court's prior order, is composed of all owner-operators who were employed by the defendant during the critical period from about February 7, 1974, to August 26, 1974. As the term "owner-operator" implies, each of such persons owned his own truck-tractor which he operated in the defendant's service as an employee-lessor.

Because of substantial increases in fuel costs affecting the trucking industry, the Interstate Commerce Commission entered an order, effective February 7, 1974, which authorized motor carriers to impose a surcharge, not in excess of 6%, upon all charges to shippers which involved the use of fuel.[1] Pursuant to that authority, the defendant did impose a surcharge at the rate of 6%.

1. The order promulgated at a General Session of the ICC on February 7, 1974, follows in its entirety:

SPECIAL PERMISSION NO. 74–2525
EMERGENCY FUEL SURCHARGE FOR LINE-HAUL TRANSPORTATION CHARGES & OTHER CHARGES—MOTOR COMMON CARRIERS

It appearing, That, in view of the critical fuel situation prevailing throughout the Nation, and its effect upon modes of transportation subject to this Commission's jurisdiction, immediate relief is warranted to permit *motor common carriers* to expeditiously recover increased fuel costs;

*It further appearing*, That, this Commission entered Special Permission Order No. *74–1825*, as amended, for the purpose of authorizing a means of passing on to the consumer on a dollar-for-dollar basis increases in fuel costs, *upon not less than 10 working days' notice*;

*It further appearing*, That, the authority granted therein did not entirely meet the immediate need of such carriers because of the requirements of extensive cost data and for 10 days' notice;

*And it further appearing*, That, the average increase in fuel expenses, including taxes, throughout the Nation since May 15, 1973, has increased such carriers costs by amounts requiring an approximate increase of 6 percent in operating revenues; and that, therefore, there is an urgent need for immediate relief in order that such carriers may recoup such average increased costs forthwith; and good cause appearing therefor:

*It is ordered*, That:

1. All such carriers or their authorized publishing agents that have tariffs or schedules on file with this Commission, or those carriers or agents that may in the future file tariffs or schedules with this Commission, are hereby authorized to depart from the terms of the governing tariff circulars to file and post on *not less than one day's notice* to this Commission and the public, an increase in passenger fares and freight charges for line-haul transportation and charges for other *services which consume fuel*, such as pickup and delivery, which must be specified in the tariffs, by means of a percentage surcharge, not to exceed 6 percent, except as otherwise authorized by this Commission.

2. The Commission shall analyze the impact of fuel expenses on a month-to-month basis to determine whether there is justification for increasing or reducing the surcharge authorized by this order; if conditions warrant, this order will be amended accordingly.

3. The surcharge filed and posted under the authority of this permission may take the form of master tariff of increase, or as a supplement to the affected tariffs. If the master tariff form of publication is to be employed, reference thereto will be made by connecting link supplement to each tariff (to be made subject to the master tariff), connecting such tariff with the master. Such supplements may be blanket supplements (a common supplement issued to two or more tariffs), provided each copy officially filed is hand marked in the appropriate places as to the supplement number and the I.C.C. number of the tariff it supplements.

4. The person actually responsible for the payment of fuel charges, by contract or otherwise, is to receive the full increase in revenue derived from surcharges published hereunder. Each publication containing the surcharge shall contain whichever of the following certifications is appropriate:

This is to certify that each carrier party to this publication has been notified that: Special Permission No. 74–2525 requires that the person actually responsible, by contract or otherwise, for the payment of fuel charges is to receive the full increase in revenue derived from surcharges published thereunder, and that a carrier's participation in a publication filed thereunder constitutes an undertaking to comply with that requirement.

or

This is to certify that the person actually responsible, by contract or otherwise, for the payment of fuel charges will receive the full increase in freight revenue to be derived from the proposed surcharge.

5. This permission will remain in effect until further order of the Commission.

6. Publications issued and filed hereunder shall be exempt from the supplemental and volume limitations of the tariff circulars, shall contain no other matter and shall bear the following notation:

"Issued on one days' notice; I.C.C. permission No. 74–2525"

7. That the authority granted by Special Permission No. 74–1825, as amended, be, and it is hereby, rescinded, to the extent it applied to motor common carriers, except to the extent that supplements filed thereunder and which provide increases of 6 percent or more, the rule relief granted therein shall remain in effect until March 16, 1974; on or before that date any motor common carrier maintaining such a surcharge must obtain separate special permission authority from this Commission to continue the effectiveness of such surcharge.

8. Any surcharge of less than 6 percent filed under authority of Special Permission No. 74–1825, as amended, regardless of whether presently in effect, or filed but not yet effective, may be retained and incorporated, but such new surcharge including that retained may not exceed 6 percent.

9. Any surcharge which exceeds 6 percent may not be filed until separate special permission authority from this Commission is obtained; if such special permission application requests authority to file a surcharge on less than lawful notice, appropriate data, properly explained and supported, must accompany the application.

10. Only one surcharge as to a tariff may be in effect at one time.

11. All outstanding orders of the Commission are hereby modified to the extent necessary to permit the filing of the tariffs authorized herein. Increases filed hereunder shall not be deemed general increases or general adjustments as defined in section 1104.1(a) of Chapter X of Title 49 of the Code of Federal Regulations.

Plaintiffs allege in their complaint that they were the persons who were actually responsible for the payment of the costs of fuel used in their equipment, that they "were to receive the full increase in revenue derived from the surcharge," and that defendant has refused to pay such sums to them, but that it has converted such revenues to its own use. They pray a judgment against defendant in an amount equal to the revenue which was derived from the surcharge during the period of time alleged.

Defendant moves to dismiss the complaint upon two grounds. First, it asserts that the theory of complaint is that ICC Special Permission No. 75–2525 is an order for the payment of money, and that the claimed right is governed by the one-year statute of limitation established by 49 U.S.C. 16(3)(f).[2] It argues that February 7, 1974, the effective date of the order, delimits the start of the limitation period, and that the complaint which was filed June 20, 1975, is barred by the statute.

Second, and as an alternative ground for dismissal, defendant asserts that the cause relates to a condition of employment and the same cannot be maintained because the dispute was not submitted to the grievance procedures provided by a collective bargaining agreement between defendant and Local 710, International Brotherhood of Teamsters. All of the plaintiffs are members of Local 710, which is their bargaining representative.

If there was any doubt that the plaintiffs are impaled upon the horns of a dilemma, a perusal of their brief must remove such doubt. They first assert that, despite the allegations of their complaint that defend-ant was required by the ICC action to pay the surcharge revenue to them, the ICC action is not an order for the payment of money and thus not governed by Section 16(3)(f). Secondly, they assert that the surcharge revenue question is not governed by the collective bargaining agreement, and therefore the grievance provisions of that agreement do not apply. Thus, in response to this motion, plaintiffs disavow both alternative theories which might sustain their complaint. One is left with the question, "What is their complaint?"

The specific allegations of complaint are meaningless, unless the complaint be interpreted as treating the ICC ruling as an order for the payment of money to the plaintiffs. That conclusion is inherent in plaintiffs' reference to the ICC ruling, in conjunction with their allegations that they were responsible for the payment of fuel costs and that they are, therefore, entitled to the added revenue produced by the surcharge.

The fact that the order neither fixes any specific amount nor contains a date for payment does not preclude the conclusion that this special permission might be construed as an order for the payment of money. A somewhat parallel situation was before several courts in a recent series of cases which arose out of a single ICC order. As the result of a tariff investigation order by the Commission, the ICC determined that a portion of a tariff published by the motor freight industry was illegal. The same order required motor carriers to refund to shippers the amount of improper charges which had been imposed under the illegal tariff. The order made no determi-

---

12. Notice of this permission shall be given to the general public by mailing a copy of this order to the Governor of each State and to the Public Utilities Commissions or Boards of each State having jurisdiction over transportation, by depositing a copy in the Office of the Secretary, Interstate Commerce Commission, Washington, D. C., for public inspection, and by delivering a copy to the Director, Division of the Federal Register, for publication therein.

This is not a major Federal action significantly affecting the quality of the human environ-ment within the meaning of the National Environmental Policy Act of 1969.

By the Commission.

ROBERT L. OSWALD
Secretary

(SEAL)

2. "A complaint for the enforcement of an order of the commission for the payment of money shall be filed in the district court or the State court within one year from the date of the order, and not after." 49 U.S.C. 16(3)(f).

nation as to amounts payable and fixed no time when such payments were to be made. It was held that that order could be enforced as an order for the payment of money, despite those omissions. *Container Corporation of America v. Admiral Merchants Motor Freight, Inc.*, 489 F.2d 825 (7th Cir. 1973); *Aluminum Company of America v. Admiral Merchants Motor Freight, Inc.*, 486 F.2d 717 (7th Cir. 1973); *Western Electric Company, Inc. v. Burlington Truck Lines, Inc.*, 501 F.2d 928 (8th Cir. 1974); *S. S. Kresge Company v. A & B Transfer, Inc.*, 488 F.2d 894 (6th Cir. 1973).

■ In the *Container Corporation* case the court held that the cause of action was governed by Section 16(3)(f) and that the statute of limitations began to run when the order became final and effective. Since, in the context of that case, enforcement of the order had been enjoined by a three-judge district court, the order did not become final and effective until that injunction was dissolved. 489 F.2d at 827–829. In the *Western Electric* case the court said that the statute of limitations was tolled by the injunction, and that discounting the period of time during which enforcement was enjoined, the complaint under consideration was timely. 501 F.2d at 935–936. In either event, the statutory limitation period does commence to run upon the effective date of the order in question.

Plaintiff cites several cases which are deemed to be wholly inapposite. The courts have logically held that if a reparation order fixes a date on or before which payment must be made, a cause of action to enforce the order first accrues and the limitation statute attaches as of the date fixed for payment, not the date of entry of the order. *Missouri Pacific Railway Co. v. Austin*, 292 F.2d 415, 418–419 (5th Cir. 1961); *Chesapeake & O. Ry. Co. v. Walton*, 99 F.2d 270, 272 (4th Cir. 1938).

*Wisconsin Bridge & Iron Co. v. Illinois Terminal Co.*, 88 F.2d 459 (7th Cir. 1937), was a suit by a carrier against a shipper to recover a balance of freight charges claimed to be due. The court held that the

claim was barred by the three-years' limitation period provided by Section 16(3)(a), and that 16(3)(f) could not be applied to measure elapsed time with reference to the date of a related ICC order. *Ibid* at 461–462.

*Midstate Horticultural Co., Inc. v. Pennsylvania Railroad Co.*, 320 U.S. 356, 64 S.Ct. 128, 88 L.Ed. 96 (1943), was a suit by a carrier to recover transportation charges. *Chicago & Northwestern Transportation Company v. Soo Line Railroad Company*, 384 F.Supp. 226 (N.D.Ill.1974), was a suit by one carrier against another upon a contract. Neither case involved the provisions of 16(3)(f).

■ Plaintiffs also argue that if the statute does apply, it would only bar that part of their claim which would have accrued prior to June 20, 1974. That argument wholly misconstrues the nature of the limitations' provisions of Section 16.

The limitations' provisions of the Act are jurisdictional. The lapse of time not only bars the remedy, but also destroys the cause of action. In *Midstate Horticultural Co., Inc. v. Pennsylvania Railroad Co., supra,* the Court held that an express written waiver of the limitations' provisions could not extend the limitations' period beyond the term provided by that Act. In *Wisconsin Bridge & Iron Co. v. Illinois Terminal Co., supra* at 461, the court said that an estoppel could not apply to create a jurisdiction which had ceased to exist under the statute.

If the plaintiffs ever had a cause of action based upon this order, that cause of action ceased to exist one year after the effective date of the order.

■ This complaint stands in no better stead, if it be construed to be grounded upon a theory other than that of enforcing an ICC order. Plaintiffs' argument that this surcharge dispute is not a matter contemplated by the collective bargaining agreement with the union is refuted by undisputed facts before the court.

The union agreement did govern wages and rental compensation to be paid to owner-operators employed by the defendant. It

contemplated that such owner-operators would supply their own fuel. With marked increases in fuel costs a reality, the defendant proposed to the union in November, 1973, that, effective November 1, 1973, the collective bargaining agreement be supplemented to provide that defendant would bear the burden of such price increments over the cost of fuel as of July 1, 1973. That proposal was accepted. Thereafter, in February, 1974, defendant proposed to the union that the agreement be further supplemented to provide that defendant would, effective from February 1, 1974, bear the entire increment in fuel costs of the owner-operators over and above the price of fuel as of May 15, 1973.[3] That proposal was also accepted.

The ICC authority to impose a surcharge related specifically to the reality of increasing fuel costs. Though the collective bargaining agreement contains no specific reference to "surcharges," it does specifically relate to the burden of fuel costs upon the owner-operators. There can be no question that the disputed subject matter does relate to conditions of the plaintiffs' employment.

The collective bargaining agreement spells out a grievance procedure for the resolution of disputes thereunder arising.[4] No grievance was ever filed by either the union or any member of the plaintiff class.

■ Grievance procedures incorporated in a collective bargaining agreement provide the exclusive, available remedy. A court has no jurisdiction to undertake enforcement of such a contract, at least until such procedures have first been invoked. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). Pertinent to the argument here asserted, the Supreme Court said in *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409, 1415 (1960), " * * * [A]rbitration of labor disputes * * * is part and parcel of the collective bargaining process itself."

The Supreme Court also said:

"The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement.

"Apart from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions of the collective agreement. The grievance procedure is, in other words, a part of the continuous collective bargaining process. * * * " *Ibid* at 581, 80 S.Ct. at 1352, 4 L.Ed.2d at 1416.

Commercial arbitration cases, as exemplified by *B. Fernandez & Hnos., S. en C. v. Rickert Rice Mills, Inc.*, 119 F.2d 809, 814–815 (1st Cir. 1941), upon which plaintiffs rely, have no application to collective bargaining agreements.

For the reasons stated, the complaint must be dismissed.

---

**3.** That supplement followed a determination by the ICC, effective February 15, 1974, that lessees of tractors must bear the increment in fuel costs over the prices in effect on May 15, 1973.

**4.** The grievance procedures are set forth as follows:

*ARTICLE 7—Grievance Machinery & Committees*

The Union and the Employer agree that there shall be no strike, lockout, tie-up or legal proceedings without first using all possible means of settlement, as provided for in this Agreement, of any controversy which might arise. Disputes shall first be taken up between the Employer and the Local Union involved.

Failing adjustment by these parties, the following procedure shall then apply:

The dispute or grievance arising out of operations under this Agreement shall then be referred to the Central States Drivers Council, in writing, and after such reference, shall be handled under the usual procedure by a representative of the Company and the Central States Drivers Council.

The Local Union, or Central States Drivers Council Committee shall have the right to examine time sheets and any other records pertaining to the computation of compensation of any individual or individuals whose pay is in dispute.

Deadlock cases may be submitted to an umpire for handling if the Union and the Company concur. Otherwise either party shall be permitted all legal or economic recourse.

Accordingly, IT IS ORDERED that defendant's motion to dismiss is ALLOWED and the complaint herein is DISMISSED, with prejudice.